WRIGHT, Respondent, vs. FRIEDMAN DEPARTMENT STORE
  COMPANY and another, Respondents, and MORAN's,
  INCORPORATED, and another, Appellants.

*January 12—February 9, 1926.*

*Contracts: Owner's duty toward building contractor: To refrain
  from interfering with contractor's performance: Acts of other
  contractors: Failure of elevator to work: Evidence: Suf-
  ficiency: Landlord and tenant: Rights of assignees of tenant:
  Conveyance of lease by assignee for creditors: Warranty:
  Liability of party acquiring lien: Obligations of original les-
  see.*

1. The tenant of a building who was obligated by the lease to
   pay for alterations in the leased premises owed a contractor,
   who under a contract with the lessee was installing an ele-
   vator in the building, a duty to desist from doing any positive
   act which might interfere with the performance of the con-
   tract, and to exercise such care over the elevator as would
   prevent any obstruction on the part of others, particularly
   its own agents and contractors.   p. 135.

2. The contract for the installation of the elevator was not
   breached by the contractor because of the failure of the
   elevator to properly operate, where such failure was due to
   the presence of mortar in the motor and safety shoes of the
   elevator, for which the lessee of the building was responsible;
   and the evidence is *held* to show that the failure of the ele-
   vator to meet the proper tests was not due to inherent defects
   but to the presence of the mortar.   p. 136.

3. The number of witnesses testifying to a given fact is not neces-
   sarily decisive in determining such fact, since the actual
   physical situation when established may be decisive.   p. 136.

4. The assignees of the lease, who had secured their title from
   the trustee of the lessee after he had become insolvent, are
   not entitled to judgment against the lessee for the amount
   required to free the leasehold from the contractor's lien for
   the installation of the elevator, where the trustee of the in-
   solvent, in selling the assets, warranted only that he was duly
   authorized to sell such assets and leasehold, and there was
   no warranty of title.   p. 137.

5. Under a lease providing that the lessee would not permit any
   alteration in the demised premises except by consent of the
   lessors and that such alterations would be paid for by the

lessee, and that the covenants and agreements contained in the lease should be binding on the successors and assigns of the lessee, it will be assumed that the assignee of the lease from the lessee's trustee took the lease with knowledge of all its provisions and that it consented to pay for any alterations made on the leased premises.   p. 138.

6. Under such a lease the assignee assumed payment for any alterations made in the premises, and was primarily liable for the lien resulting from the installation of the elevator. p. 138.

APPEAL from a judgment of the circuit court for Douglas county: W. R. FOLEY, Circuit Judge.  *Affirmed.*

The appeal is from a judgment adjudging a mechanic's lien in plaintiff's favor.

All of the defendants excepting *Bentley P. Neff* are Wisconsin corporations.  For brevity's sake, the defendant *Friedman Department Store Company* will be referred to herein as *"Friedman's;"* the defendant *Moran's, Incorporated,* as *"Moran's,"* and the *Wisconsin Building Company* as the *"Building Company."*

The *Building Company* at all times herein mentioned was the owner of certain premises in the city of Superior, with a building situated thereon known as the Telegram Building, which premises the Telegram Company leased in 1919 for a period of ten years.  On November 12, 1921, the *Building Company* and its lessee, the Telegram Company, leased to *Friedman's* a certain part of the property covered by the Telegram Company's lease for a department store for a term of twenty-five years, commencing on May 1, 1922, and terminating on April 30, 1947.  Among the provisions in the lease to *Friedman's* is one which obligated *Friedman's* to pay for any alterations made by it on the premises included in its lease.

The plaintiff had had many years of experience in the installation of elevators, was familiar with their construction and operation, and was a mechanical expert in that line.  On July 6, 1922, *Friedman's* entered into a contract with the plaintiff for the furnishing and installation of a passenger

elevator in the building situated upon its leased premises, and pursuant to the terms of such contract *Friedman's* paid to the plaintiff one half of the agreed cost of the elevator at the time when the same was furnished and ready for installation, and the balance was payable on the completion of the contract. The contract contained, among other provisions, the following: "All agreements are contingent upon strikes, accidents, delays of carriers, and other causes unavoidable and beyond my control." It was further understood that the hatchway, the penthouse, the pit, and the power were to be furnished by *Friedman's.*

On or about July 20, 1922, the machinery and elevator appliances were on the ground ready for installation, but *Friedman's* had not at that time furnished and completed the hatchway or the other things which it agreed to furnish, but the plaintiff, in order that his contract might be performed with all due and convenient speed and in order to accommodate *Friedman's,* commenced with his work of installation, and proceeded in the performance as far as the situation existing would warrant. When the elevator was ready for a practical test, some time during the early part of August, such test could not be made because *Friedman's* had failed to furnish the electrical power, and a delay of about one month was occasioned as the result of such failure. During this delay it is claimed by the plaintiff that *Friedman's,* through its contractor, caused the hatchway to be plastered, and while the plastering was in process of being performed the plastering contractor and his employees used the elevator as a platform from which they did the plastering. The plastering evidently was done in such a careless and negligent manner that large quantities of plaster were spattered against the guide rails of the elevator and upon and into the mechanical appliances being a part thereof.

On or about the 25th day of September, 1922, the installation of the elevator was deemed to be completed, and the state elevator inspector was on hand to subject the elevator

to practical tests to enable him to certify to its efficiency so that it could be used for the purpose for which it was designed. The tests made at that time proved unsatisfactory. The safety device which is installed in such an elevator is designed to operate in such a manner that, if the cables are either too slack or break, this device will automatically be called into operation so that the dogs in the safety device will be thrust up and against the guide rails and thus prevent the elevator from falling a distance of more than five feet. The safety device did not properly operate, and the inspector therefore could not approve the elevator. He also directed reinforcement of the hatchway, and that heavier angle-irons from the pit to the penthouse be inserted, and prohibited the use of the car until proper alterations were made. The obligation of making these alterations as to the hatchway and the angle-irons did not devolve upon the plaintiff, but upon *Friedman's*.

In November, 1922, it was thought that the elevator was ready for another inspection, but no inspector of the industrial commission appeared upon the scene until January 29, 1923. In the meantime, between the early part of November and January 29th, the elevator was used by *Friedman's* and appeared to give reasonable satisfaction, excepting only that the operation of the motor seemed slightly defective. In an inspection made in January by the inspector the safety device appeared still to be defective, and the elevator dogs would not hold the elevator when the cables became slack.

Continued attempts were made to ascertain the cause of the defects in the mechanism of the safety device until about April 6, 1923, when a drop test was attempted, with unfortunate results, the dogs of the safety device utterly failing to perform their mission, causing the elevator to fall clear down to the basement, which resulted in great damage both to the elevator itself and to the pit. At this time the plaintiff's health failed and he was unable to continue his work.

An examination made at that time disclosed that mortar

had gained entrance into the safety shoes of the safety device and into the motor gear case, and the failure of the elevator to operate properly was attributed to this cause.

The manufacturer of the elevator, being desirous of maintaining the good reputation of the mechanism furnished by him and of demonstrating its efficiency, concluded to and did take over the furnishing and installation of a new elevator, and on September 11, 1923, the same. was subjected to a proper drop test in the presence of a representative of the industrial commission, and the elevator was found satisfactory and approved.

*Friedman's* being insolvent, on or about the 28th day of September, 1923, executed a voluntary assignment for the benefit of creditors to one W. B. Cross as trustee, and the latter accepted such trust, and in the due course of the administration thereof and in the beginning of January, 1924, sold, assigned, and transferred the assets of the assignor, including its leasehold interest, to the defendant *Moran's*.

On or about the 1st day of March, 1924, *Moran's* entered into an agreement with the *Building Company* under and pursuant to which the lease of *Friedman's* was annulled and canceled and a new lease· for a term of years executed to *Moran's*. Such new lease, among other things, contained the following provision:

"The lessors agree to protect and save harmless the lessee from all claims and demands of every kind and nature upon account of the initial cost of said elevator or from any claim or demand of any person or persons upon account of the furnishing of labor or material in connection with said elevator which has been heretofore incurred by the lessors or either of them or any other person or persons whatsoever, for which the lessee may be in anywise obligated."

A short time after the sale of *Friedman's* assets and leasehold interest to *Moran's,* the trustee, Cross, died, and *Friedman's* shortly thereafter executed a new assignment of all of its assets to the defendant *Neff* as trustee, who was, during

the progress of the trial, impleaded as a party defendant to the action.

The court found, among other things, that the failure of the elevator furnished by the plaintiff was not due to any defect in the elevator itself or in its mechanism, or to any negligence on the part of the plaintiff, but that it resulted from the negligent acts of *Friedman's* plastering contractor in the performance of work in connection with the hatchway which *Friedman's* was obligated to perform, and thereupon ordered judgment for the balance due the plaintiff against *Friedman's,* and adjudged a mechanic's lien for the amount so adjudged as due against the elevator itself and against the leasehold interest of *Friedman's,* and directed the elevator and the leasehold interest to be sold and the proceeds applied towards the payment of plaintiff's claim and the costs, with a personal judgment for any deficiency against *Friedman's;* and ordered judgment against all of the defendants for that portion of the costs which shall remain unpaid after the application of the proceeds of the sale to the payment of plaintiff's judgment.

Judgment having been entered accordingly, *Moran's* and the *Building Company* have prosecuted this appeal. Further facts will be stated in the opinion. ·

For the appellants *Moran's Inc.* and *Wisconsin Building Company* there was a brief by *Hanitch, Hartley & Johnson* of Superior, and oral argument by *Clarence J. Hartley.*

For the respondent *Wright* there was a brief by *Steele & Tipton* of Superior, and oral argument by *William M. Steele.*

For the respondents *Friedman Department Store Company* and *Neff* there was a brief by *G. H. Winsor* and *C. W. Stilson,* both of Duluth.

DOERFLER, J. *Friedman's,* in its answer, denied that the plaintiff had complied with his contract, and alleged that the failure of the plaintiff to so comply resulted in damages in an amount in excess of plaintiff's claim, and prayed that the

damages be set off on the amount awarded the plaintiff.
*Moran's* and the *Building Company* took a similar position.

That there were a number of long delays in the installation of the elevator must be admitted. However, immediately after entering into the contract the plaintiff showed laudable dispatch in furnishing the elevator. While the obligation to supply the hatchway, the penthouse, the pit, and the power rested upon *Friedman's*, it appears that the latter did not move with reasonable dispatch to facilitate the installation at an early date. The plaintiff had substantially performed his contract in furnishing the elevator and installing it early in August, 1922. The elevator could not then be tested because no power had been furnished. While waiting for power *Friedman's* let the contract for the plastering of the hatchway, and while this work was being performed the plastering contractor, without the consent of the plaintiff, used the top of the elevator as a moving platform to facilitate him in the doing of his work.

If the plaintiff's testimony be accepted, the plastering was done before the 25th day of September, when the first real practical test was made of the elevator. While it was evident that an unworkmanlike job was performed by the plastering contractor and his employees, in that they permitted soft mortar to be splashed up against the guide rails and in and over the elevator, the motor, and the other mechanical parts, no one suspected that any of this mortar had found its way into the safety shoes or into the motor in such a way as to cause an obstruction to the proper operation of the elevator. The state elevator inspector was present at the first test, observed the running of the elevator, and assumed that the defects were either inherent in the mechanism or in an improper installation. At that time the inspector also directed certain changes in the hatchway and in the angle-irons, which duty devolved upon *Friedman's*. The plaintiff and his experts apparently devoted every effort to discover the cause of the trouble and made a number of

changes and adjustments, and concluded in the beginning of December that the defects had been remedied.

Owing to the inability to obtain the services of a state inspector, the second test was not made until the 29th of January, 1923. The tests then made were also unsatisfactory and the installation was not approved. The principal defect at that inspection also consisted in the failure of the safety device to operate properly.

Renewed efforts were then made to discover the defects and further adjustments and changes were made, and when the safety device was again tested by a drop test on April 6, 1923, its utter failure to operate was manifested by the elevator dropping to the bottom of the pit with the entire load thereon. The real cause of the trouble was then for the first time discovered. It was then ascertained that mortar had found its way into the safety shoes, the motor gear case, and other parts of the machinery, and it was the opinion of the experts that this condition fully accounted for the defective operation of the appliance.

In the last test of the elevator referred to, the appliance was practically ruined and wrecked. A new elevator was thereupon furnished by the manufacturer, was installed and tested, and gave ample satisfaction, so that it was approved by the representatives of the industrial commission. During the greater portion of the time from September, 1922, until April, 1923, the elevator was used by *Friedman's* notwithstanding the defective condition of the safety device.

It is argued by appellants' counsel that the presence of mortar in the motor and in the safety shoes should have been discovered long before April, 1923, and that plaintiff's failure to make such discovery manifests negligence and constitutes a substantial breach of his contract. However, it must be borne in mind that this elevator was furnished by the plaintiff for the defendant *Friedman's;* that it was installed in its building, over which it had supervision and control; that it owed the duty to the plaintiff to desist from

doing any positive act which would have a tendency to interfere with plaintiff's performance of his contract, and to exercise such care and supervision over this elevator as would prevent any interference or obstruction on the part of others, and particularly its own agents or contractors. No adequate cause at any time was ascertained why the elevator did not properly operate, excepting the presence of the mortar, and for this *Friedman's* was responsible. Plaintiff, his experts, and the inspectors were firmly of the opinion that the defect consisted in the mechanism of the elevator itself, and therefore every conceivable mechanical test and change was tried in order to cause the elevator to function properly.

Under these circumstances it would appear to us that the trial court properly held that the plaintiff did not breach his contract, and that the failure of the elevator to operate properly was due to the negligent acts of the plastering contractor employed by *Friedman's.* It would certainly be an anomaly in the law to allow damages to *Friedman's* when, as found by the court, these damages ensued as the result of its own acts.

But counsel for the appellants take the position that the preponderance of the evidence shows that the first test of the elevator on September 25, 1922, was made before the hatchway had been plastered; that the safety device did not then properly operate; and that therefore the failure of the elevator to withstand a proper test could be due solely to inherent defects in the elevator itself and in its mechanical parts.

It is true that one of the experts of the plaintiff and a number of witnesses produced by the defendants testified that when the first test was made the plastering had not yet been done. This is contradicted, however, by the plaintiff's testimony and by the physical fact, which was established beyond controversy, that the presence of mortar in the motor and in the safety shoes fully accounted for the defective operation, and that no other adequate cause was advanced. The number of witnesses testifying to a given fact is not necessarily decisive in determining such fact. The actual

physical situation when established, and particularly when it fully accounts for a trouble like the one herein involved, may be decisive in the establishment of a fact, notwithstanding that numerous other witnesses may testify otherwise. A careful reading of the evidence in this case convinces us that the trial court was right in its deductions and conclusions, and its findings in that behalf, therefore, cannot be disturbed.

Appellants' counsel further argue that in the event that it should be held that *Friedman's* is not entitled to damages against the plaintiff, that nevertheless the appellants are entitled to judgment against *Friedman's* and *Bentley P. Neff,* trustee, for any amount they may be required to pay to free the leasehold interest from the plaintiff's lien. Upon the sale of the assets of *Friedman's,* including the lease, Cross, the trustee of the insolvent estate, assigned and transferred to *Moran's* all the right, title, and interest that *Friedman's* had in such assets and in its leasehold. In the document delivered by the trustee to *Moran's* the trustee warranted only that he was duly authorized to sell such assets and leasehold. There was no warranty of any title. In 5 Corp. Jur. 1223, it is said: "The purchaser from an assignee for the benefit of creditors obtains the title of the original owner through the power in trust vested in the assignee, subject to any liens against the property which are not discharged by the sale." In 2 Ruling Case Law, p. 710, § 61, it is said: "The right to sell by an assignee does not include the right to warrant the title conferred by such sale." The law as thus laid down by these authorities finds ample support in the decisions referred to in the notes to these quotations. Therefore Cross, the trustee, merely sold the right, title, and interest of his assignor, and the purchaser under the instrument of conveyance took only such right, title, and interest, subject to the plaintiff's claim for lien thereon.

The lease of the *Building Company* and the Telegram Company to *Friedman's* dated the 12th day of November,

1921, contains a provision that the lessee "will not make or permit any alteration of or upon any part of said demised premises . . . except by written consent of lessors first had and obtained, and if any alterations are consented to, then all alterations, of any form, kind, nature, or description, made to said demised premises, shall be wholly paid for by said lessee." The closing paragraph of the lease also provides that "All the parties to this lease agree that the covenants and agreements herein contained shall be binding upon, apply, and inure to their respective successors and assigns." So that we must assume that when *Moran's* took an assignment of the leasehold interest of *Friedman's* from the trustee, it took it with knowledge of all of the provisions of the lease, and in accepting such assignment it consented to and undertook to perform the various covenants and agreements of such lease; and one of the agreements so undertaken was the one that it would pay for any alterations made upon the leased premises. As between *Friedman's* and *Moran's*, therefore, the latter became primarily liable and the former secondarily. So that the legal effect of the transfer to *Moran's* by Cross, the trustee, resulted not only in the transfer of the right, title, and interest of *Friedman's* in the leasehold, but also in an assumption on the part of *Moran's* of the obligation to pay for the installation of the elevator.

It is true that a situation is here presented which will result in *Moran's* being obliged to pay the lien judgment in order that it may be protected from the title which third persons may obtain on the foreclosure sale, or that the *Building Company* will be obliged to pay such lien judgment, under its agreement with *Moran's* under the new lease between it and *Moran's*. If *Moran's* pays such judgment it is complying with an obligation which it has assumed; if the *Building Company* pays, it will be pursuant to its voluntary obligation assumed in its lease with *Moran's*, to which lease neither *Friedman's* nor the trustee was a party.

It follows, therefore, that the learned circuit judge was correct in holding that neither *Moran's* nor the *Building Company* has any claim whatsoever against *Friedman's.* The lien was filed in due time, the action of foreclosure was begun within the time specified in the mechanics' lien statutes, and the judgment follows strictly the provisions of such statutes, and cannot be disturbed.

*By the Court.*—The judgment of the lower court is affirmed.